# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 18, 2013

## STATE OF TENNESSEE v. EDWARD WARREN WISE

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1215     J. Randall Wyatt, Jr., Judge**

---

**No. M2012-02129-CCA-R3-CD - Filed August 6, 2013**

---

The defendant, Edward Warren Wise, was convicted by a Davidson County Criminal Court jury of voluntary manslaughter and sentenced to a Range I sentence of six years in confinement. On appeal, he argues that the trial court erred in allowing the State to introduce the preliminary hearing testimony of a witness who died prior to trial and also challenges the sufficiency of the convicting evidence. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), Melissa Harrison and Randi A. Hess (at trial), Assistant Public Defenders, for the appellant, Edward Warren Wise.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Amy Hunter and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant was charged with premeditated first degree murder arising out of the stabbing death of the victim, David Ross, who was also known as "JFK."

The victim suffered from schizophrenia and, as a result, talked to himself and heard

voices in his head. He went by the name of "JFK" because he believed that his father was the former president John F. Kennedy, Jr., and he believed that his mother was Princess Leia from Star Wars. The victim had numerous tattoos, including several on his face, related to his delusions. He also believed that he received "satellite clicks," which he tried to stop by "mak[ing] Xs in the air." The victim was described as "a very friendly fellow, everybody loved him," but would sometimes "kind of go off the deep end."

On January 11, 2011, Jonathan Field invited the victim to his property at 232 Franklin Limestone Road in Davidson County, where he lived with a roommate, Todd Davis. The victim's birthday was January 13, and they were going to "have a little birthday party for him." The victim agreed to come but only if he could bring the defendant, who was also known as "Scooby Doo," with him. The victim and the defendant arrived by bus that afternoon, somewhere between 1:30 and 3:00 p.m. They informed Field that they had already been drinking beer. The four men sat around, listening to music and drinking whiskey. According to Field, they had "a pretty good number" of drinks and, when they ran out of liquor, the victim and the defendant walked to the store to buy more.

The party continued until 1:30 a.m. when they were all "fixing to go to bed." However, the victim "was pretty rowdy. He was hollering and carrying on." The victim "was getting some satellite clicks" and was "jumping around and stuff and hollering." He appeared to also be hearing voices and communicating with something that no one else could see. Field recalled that the victim said to the defendant, "You're dead. You are Scooby bones. You are dead." The victim also stated to Davis, "You're dead." The victim looked at Field and said, "Naw, well, maybe I don't know. You are dead too." Field explained that the victim was not being mean or scary but, instead, funny. He said that the victim acted like that "[a]ll the time" but was "never mean" and "never hurt a soul."

Davis and the defendant both lay down on nearby mattresses, and Field was sitting in a chair at his computer trying to locate a song that the victim was persistently requesting. Field recalled:

> I was on the internet . . . trying to get the Winger video up that [the victim] liked so much and . . . I was facing the computer at my desk and [the defendant] was sitting here . . . with his back to the . . . wall and to my right and [the victim] was about eight feet, ten feet away from me laying down and he was still hollering and I said, "All right. Just shut up, man, I'm, I'm bringing it up." And [the defendant] said, "I will make his ass shut up." And, uh, I can't swear exactly what I said after that. . . . I think I said, "Y'all fight nice girls. Now, y'all fight nice girls."

And then when [the defendant] stood up I said, "Now, just leave him alone, [the defendant]." And I am trying to get this song up so [the victim] will shut up and the next thing I know [the defendant] is on top of [the victim] within 10 seconds [the defendant] has got his hands on [the victim's] shoulders.

. . . .

[The defendant] was kind of kneeling and ha[d] his hands on [the victim's] shoulders and I couldn't really understand what he was saying, he was kind of grunting or something and when I saw that, I said, "All right. Get off of [the victim][,] [the defendant]." I stood up and turned around and [the defendant] got up off of [the victim] and [the victim] leaned forward just for a second and he shuttered and fell back and I heard a metallic sound and [the defendant] said, "Mother-f[]cker will remember my name now."

And I looked and I saw blood pouring out onto the floor where . . . [the victim]'s legs were off of the bed, and I said, "My God. What did you do?" And I screamed for [Davis], "[Davis], get up." [Davis] just laid down maybe 30, 45 seconds before that, you know, he, [Davis] could fall asleep like nothing I have ever seen.

When Davis inquired what was going on, Field informed him, "We got a situation." The defendant sat down in a chair, folded his arms, and said, "Let's bury this asshole." Field removed the victim's shoes and pants to "see where the blood was coming from." He told the defendant to "[l]eave . . . before the cops get here, because I am calling them right now . . . . Get the f[]ck out of here." The defendant grabbed his black backpack and left.

Field cut off a piece of canvas from a roll of artist's canvas with "[t]he knife that [the defendant] stabbed [the victim] with," which he found between the victim's legs. He observed that the black plastic handle was broken off of the knife. Field attempted to use the piece of canvas as a tourniquet on the victim's leg as he called 911. The victim continued to bleed profusely while Field was on the phone with the 911 operator but, when the bleeding stopped, he informed the operator that the victim had died.

According to Field, the victim was lying down when the altercation began and never stood up. By Field's estimate, the entire encounter between the victim and the defendant lasted only approximately fifteen seconds; therefore, it surprised him to learn that the victim had been stabbed four times and had cuts and scratches all over his face, neck, arms, and legs.

-3-

In trying to determine the defendant's motive for attacking the victim, Field hypothesized:

> Well, apparently, [the defendant] was angry that [the victim] would make up names for him, like, instead of Scooby Doo he would call him Scooby bones and instead of Edward Wise he would call him Edward Stupid or Edward dumbass or something like that, you know, just childish stuff, but I think that that and just jealously, because everybody liked [the victim] and, you know, if [the victim] didn't drag [the defendant] around nobody wanted anything to do with him, but it was okay . . . if he was hanging out with [the victim] he was okay, but by hi[m]self nobody would associate with him.

A team of six to nine police officers was dispatched to the scene around 1:45 a.m. on January 12, 2011, in response to the report of a stabbing. They arrived within five minutes of receiving the call. At the scene, the police found an intoxicated Todd Davis walking down the driveway yelling for help. When they entered the barn, they found Field trying to perform CPR on the victim. The scene was "extremely bloody." According to the first officer on the scene, "a large pool of blood to the left side of the bed . . . actually looked a little coagulated. It was thick. It looked like it had been there for several several minutes and it was also pretty cold outside as well."

One of the responding officers recalled that Field told them that "Scooby did it." Another officer remembered that Field said to them, "I can't believed Scooby Doo has killed JFK." Another officer recalled that Davis told him that "Scooby killed JFK. JFK is dead."

A description of the suspect was sent out from officers on the scene, that being "a male white wearing dark clothing that went by the nickname Scooby." In addition, while en route to the scene, some officers saw a figure on the porch of a nearby residence who appeared to be hiding. One officer stopped at the residence and called out to the person, but as the officer was walking toward him, the individual walked out of sight toward the back of the house. A description of the individual's clothing – jeans, a dark jacket, and a backpack – was broadcast over police radio.

Approximately ten minutes later, a detective who was responding to the scene stopped the defendant as he emerged from the woods onto the main road. The defendant had what appeared to be blood spots on his pants and shoes, but not on his hands. His demeanor was "very calm and he didn't really show much emotion." The detective asked him if he went by the nickname "Scooby," and the defendant replied, "No." Officers searched the defendant and found a folding pocketknife with a three-inch blade in one of the defendant's pockets. The knife had what was determined to be the victim's blood on it. A blue hooded sweatshirt

containing what was determined to be the victim's blood was found in the defendant's backpack.

Investigators found a broken knife handle at the scene of the stabbing but did not find a knife blade. However, Field found the blade of the knife presumably used to stab the victim two or three days later halfway under the mattress where the stabbing occurred. The knife blade measured approximately seven or eight inches in length. The victim's blood was found on the knife blade, but the defendant's blood was not.

An autopsy revealed that the victim sustained "multiple sharp force injuries," the most significant of which being a stab wound to his left leg that entered the back of his left thigh and came out the front of his thigh, completely severing the femoral artery. He also had stab wounds to the back of his left shoulder and left hip, as well as superficial cuts to his neck, palm, and pinky finger. The stab wound to the victim's shoulder was 4½ inches in depth, and the stab wound to the thigh was 5¼ inches deep. The victim's cause of death was determined to be "multiple sharp-force injuries." At the time of autopsy, the victim had a blood alcohol content of .31, and marijuana was in his blood as well.

Although Todd Davis died prior to trial, a recording of his testimony from the preliminary hearing in this case was played for the jury. In his preliminary hearing testimony, Davis testified that he "heard people fussing" as he was lying down trying to go to sleep. He thought that he had "nodded off" when Field awakened him saying, "[W]e got a situation here." He recalled that, before the incident, he heard the defendant say, "I'll shut him up, " and that after the incident, the defendant said, "He'll remember my name." He said that the victim and the defendant were arguing prior to the stabbing and characterized the argument as "long [and] drawn out," lasting about an hour. He noted that the victim and the defendant were both drunk. Davis admitted that he did not actually see the stabbing take place or any type of physical altercation between the two, but he explained that he "knew something went on." He also confirmed that he had been drinking. Davis recalled that several hours before the stabbing, he heard the victim and the defendant showing each other their knives. Davis recalled that when he and Field and were cleaning up the scene the next day, the knife "just fell out of the bed sheet[.]"

After the conclusion of the proof, the jury found the defendant guilty of voluntary manslaughter as included in the indictment.

## ANALYSIS

### I. Preliminary Hearing Testimony

On May 16, 2012, the State filed a notice that Todd Davis had died and was thus unavailable to testify but that he had testified at the preliminary hearing and requested that his prior testimony be admitted pursuant to Tennessee Rule of Evidence 804. At a hearing conducted on May 18, 2012, defense counsel objected to the admission of Davis' preliminary hearing testimony, arguing that there had not been an adequate opportunity for cross-examination at the preliminary hearing because the purpose of cross-examination at a preliminary hearing was different than at a trial. Defense counsel asserted that the admission of Davis' preliminary hearing testimony would violate his right to confront and cross-examine witnesses against him, as outlined in Crawford v. Washington, 541 U.S. 36 (2004). After taking the matter under advisement, the trial court entered an order allowing the introduction of Davis' preliminary hearing testimony as substantive evidence, and the testimony was subsequently admitted at trial.

The defendant argues that the trial court erred in allowing the State to introduce the preliminary hearing testimony of Todd Davis, raising the interrelated arguments that Davis' testimony was not admissible under the "former testimony" exception to the hearsay rule because he did not have a similar motive to develop the testimony at the preliminary hearing as he would have had at trial, and that Crawford's right to cross-examination was not satisfied because of the lack of similar motive.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. One such exception is where the former testimony of an unavailable witness is allowed when the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination. Tenn. R. Evid. 804(b)(1). "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). As such, we will not reverse the trial court's rulings on this issue absent a showing that it abused its discretion. Id.

In addition, the Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9. In order to protect a defendant's right to confrontation, before the prior testimony of a witness will be admitted, the State must show that (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 68.

A panel of this court in <u>State v. Michael James Grubb</u>, No. E2005-01555-CCA-R3-CD, 2006 WL 1005136 (Tenn. Crim. App., Knoxville, Apr. 18, 2006), succinctly addressed this issue:

> The "purpose of a preliminary hearing is . . . to determine whether there exists probable cause to believe that a crime has been committed and that the accused committed the crime." <u>State v. Lee</u>, 693 S.W.2d 361, 363 (Tenn. Crim. App. 1985). The difference in the standard of proof not-withstanding, the basic purpose of the preliminary hearing and the trial are not "totally separate" as the Defendant argues, but rather deal with precisely the same issue: whether or not the accused is guilty of the crimes for which he or she is charged. <u>See</u> <u>State v. Howell</u>, 868 S.W.2d 238, 251 (Tenn. 1993) (holding that a preliminary hearing testimony of a declarant could be introduced at trial under the former testimony exception based primarily on a finding that "at both the [preliminary] hearing and the subsequent trial, the testimony was addressed to the same issue of '[w]hether or not the defendant[ ] had committed the offense' charged."). Accordingly, we conclude that the Defendant in this case had the opportunity to cross-examine Officer Beyer at the preliminary hearing with the same motives that would have guided his cross-examination of the declarant had he been available at trial. <u>See</u> <u>State v. Brian Eric McGowen</u>, No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at *11 (Tenn. Crim. App., Nashville, Aug. 18, 2005) (holding that the trial court did not err in allowing preliminary hearing testimony to be introduced at trial under the former testimony exception because the motive to cross-examine the defendant was the same at both the preliminary hearing and trial). Thus, <u>Crawford's</u> cross-examination requirement was met in this case.

<u>Id.</u> at *7.

We find the analysis in <u>Michael James Grubb</u> persuasive. In this case, the defense's cross-examination of Davis was quite thorough. Through his questions, counsel emphasized that Davis did not see what happened between the victim and the defendant because he was asleep. Counsel also highlighted that Davis had been drinking. Counsel further asked about the extent and content of the argument that transpired between the victim and the defendant and whether the victim was threatening the defendant. Counsel obtained a concession from Davis that he was "listening to the head phones" during some of the ordeal. We conclude that Davis' preliminary hearing testimony qualifies as "former testimony" because the defendant had a similar motive to develop the testimony at the preliminary hearing as he would have had at trial, and the cross-examination requirement from <u>Crawford</u> was met in this case.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish his identity as the perpetrator of the offense beyond a reasonable doubt.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given

> to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

In the light most favorable to the State, there was sufficient evidence for the jury to determine that the defendant was the one who stabbed the victim, causing his death. Field testified that the victim was rambling about wanting to hear a particular song, and the defendant said, "I will make his ass shut up." Field commented for the two to "fight nice" but, when the defendant stood up, instructed him to "just leave [the victim] alone." The next thing Field knew, the defendant was on top of the victim with his hands on the victim's shoulders, grunting. Field instructed the defendant to get off the victim and, when he did, the victim "leaned forward just for a second and he shuttered and fell back and [Field] heard a metallic sound and [the defendant] said, 'Mother-f[]cker will remember my name now.'" Field then saw blood pour out onto the floor. The defendant sat down in a chair, folded his arms, and said, "Let's bury this asshole." Davis' testimony from the preliminary hearing that, before the incident, the defendant said, "I'll shut him up," and that after the incident, the defendant said, "He'll remember my name," corroborated Field's account.

Responding officers recalled that both Field and Davis told them that "Scooby" had killed the victim. When the defendant was captured by police emerging from the woods nearby, he had what appeared to be blood spots on his pants and shoes, and he denied going by the nickname "Scooby." A blue hooded sweatshirt with what was determined to be the victim's blood was found in the defendant's backpack. The identification of a defendant as the perpetrator of a crime is a question of fact for the trier of fact to determine from the evidence presented at trial. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Although neither Field nor Davis actually saw the defendant stab the victim, the circumstantial evidence was such that a rational trier of fact could reach that conclusion. Any questions concerning the credibility of the witnesses or inconsistencies in the proof were resolved by the jury as the trier of fact.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE